UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CEDRIC THOMPSON,

Plaintiff,

v.                                                    CAUSE NO. 3:24-CV-1016-CCB-SJF

WARNER, et al.,

Defendants.

## OPINION AND ORDER

Cedric Thompson, a prisoner without a lawyer, moves for a preliminary injunction. (ECF 4.) He was granted leave to proceed on the following claims: (1) a claim against several correctional officers for money damages for failing to protect him from being attacked by other inmates in October 2024 in violation of the Eighth Amendment; (2) a claim against two of the officers for failing to obtain medical care for him after the attack; and (3) a claim against the Warden of Miami Correctional Facility ("MCF") in his official capacity for injunctive relief related to his ongoing need for protection from other inmates. (ECF 5.)

In his motion for a preliminary injunction, Thompson asserts that he is at risk of being harmed by other inmates. (ECF 4; *see also* ECF 26, 27.) His filings are somewhat difficult to decipher, but he appears to ask that the court order him to be moved to a different facility. The court ordered a response from the Warden, which has now been

filed. (ECF 29.) The Warden argues that preliminary injunctive relief is unnecessary because prison officials are taking adequate steps to protect him from harm.[1] (*Id.*)

## BACKGROUND

Records submitted by the Warden reflect that Thompson arrived at MCF in July 2024. (ECF 29-1 ¶ 8.) Shortly after his arrival, he submitted a request for protective custody asserting that inmate Michael Carr, an alleged member of the Vice Lord gang, placed a "hit" on him because of Thompson's involvement in Carr's criminal case. (*Id.* ¶ 13; ECF 29-3 at 1.) Less than a week later, however, he submitted a waiver of his request for protective custody indicating that he wished to be housed in general population. (ECF 29-3 at 3.) On August 1, the Protective Custody Review Committee ("PC Committee") denied Thompson's protective custody request because of his request to return to general population. (ECF 29-1 ¶ 16; ECF 29-3 at 4.)

A few days after the PC Committee's decision, Thompson submitted a new request for protective custody, again stating that gang members had put a "hit" on him. He mentioned both inmate Carr and inmate Deandra Plant. (ECF 29-1 ¶ 17; ECF 29-3 at 5-6.) The following day, Thompson was moved to a different cell pending review of his protective custody request. (ECF 29-1 ¶ 17.) On August 7, he was moved again to a cell in the A-cellhouse, a restrictive housing unit where inmates are in single-person cells. (*Id.* ¶ 19.) The PC Committee ultimately denied his protective custody request, although

---

[1] By operation of the Local Rules, any reply by Thompson was due March 21, 2025. N.D. Ind. L.R. 7-1(d)(2)(B). That deadline has passed and no reply was filed.

he was allowed to remain in the restrictive housing unit for several weeks. (*Id.* ¶¶ 20-21.)

In late September, he was moved to general population in the L-cellhouse. (*Id.* ¶ 21.) On October 9, he submitted another protective custody request stating that he was being extorted and sexually harassed by his cellmate and other gang members. (ECF 29-1 ¶ 22; ECF 29-3 at 8.) That afternoon, Thompson was moved to the K-cellhouse. (ECF 29-1 ¶ 23.) His new cellmate was Marquette Buie, who was not one of the individuals identified in Thompson's protective custody requests. (*See* ECF 29-3 at 1-2, 5-6, 8.) Buie also was not known to prison officials to affiliate with a gang, nor did Buie have any prior allegations asserted against him under the Prison Rape Elimination Act. (ECF 29-1 ¶ 24.)

On October 11, Thompson filed a new protective custody request stating that he did not feel safe, that a gang member "kept having people jump me," and that other inmates threw feces at him. (ECF 29-1 ¶ 25; ECF 29-2 at 9.) Later that same day, a non-party correctional lieutenant conducted an interview with Thompson. He claimed that his cellmate, Buie, had tried to make him perform oral sex and that the two had gotten in a fight. He claimed the fight had resulted in an injury to his head, but the lieutenant did not see any visible injury. (ECF 29-1 ¶ 26; ECF 29-3 at 10.) He was taken to the medical unit, evaluated by medical staff, and released. (*Id.* ¶ 27.) Buie was immediately moved to a different cell, and Thompson returned to the cell after his release from the medical unit. (*Id.* ¶ 28.)

On October 12, Thompson filed another protective custody request stating that he was "getting abused and extorted by the [Gangster Disciple] upstairs" and that an unnamed inmate tried to open his cell door the night before. (*Id.* ¶ 29; ECF 29-3 at 11.) His request for protective custody was denied because he was already in a cell by himself and the unit was currently on lockdown. (*Id.* ¶ 30.) On October 14, Thompson filed another protective custody request stating that he had been "sexually and physically and mentally abused all weekend." (*Id.* ¶ 31; ECF 29-3 at 12.) He was approved to be moved to restrictive housing in the A-cellhouse pending review by the PC Committee. Early the next morning, he was moved to a single-person cell in the A-cellhouse. (ECF 29-1 ¶¶ 31-32.) He has remained in that cell to date. (*Id.* ¶ 34.)

On October 16, Investigator Neil Johnson from the prison's internal affairs department was assigned to investigate Thompson's report of being assaulted by Buie on October 11. (*Id.* ¶ 35.) That same day, Investigator Johnson interviewed Thompson, who claimed that Buie held a knife to his throat and made him perform oral sex. (*Id.* ¶ 37.) This appeared to be different from his earlier report, in which he stated that Buie had only tried to sexually assault him and did not mention any weapon. (*Id.* ¶ 26.) The following day, Investigator Johnson interviewed Buie, who denied Thompson's allegations. (*Id.* ¶ 38.) Investigator Johnson submitted a request that any future interactions between Thompson and Buie be monitored, which was approved by the Warden. (*Id.* ¶ 39.) After completing his investigation, Investigator Johnson determined that Thompson's allegations were unsubstantiated. (*Id.* ¶ 40.) The PC Committee

ultimately denied his request for protective custody, in part because he had already been moved to the restrictive housing unit. (*Id.* ¶ 41; ECF 29-2, at 13.)

In December, a case worker submitted a recommendation that Thompson be moved to Indiana State Prison. (*Id.* ¶ 43.) Indiana Department of Correction ("IDOC") central office personnel denied the request, citing Thompson's "negative adjustment" at MCF and the fact that he had only been there less than a year. (*Id.* ¶ 44.)

At present, Thompson continues to be housed in the A-cellhouse in a single-person cell. (*Id.* ¶¶ 32-34, 45.) His placement has been reviewed approximately nine times by prison staff and continues to be reviewed monthly. (*Id.* ¶ 46.) Since moving to the A-cellhouse, there have been no conduct reports, incident reports, or protective custody requests submitted by or involving Thompson. (*Id.* ¶ 47.) Nor has Thompson reported any physical or sexual assaults during this period. (*Id.* ¶ 48.) None of the inmates previously identified by Thompson as causing him problems (Buie, Carr, and Plant) are housed in the A-cellhouse, nor do they have access to that unit. (*Id.* ¶ 49.) Prison officials have no intention of moving him unless he asks to be returned to general population or is transferred to a different facility. (*Id.* ¶ 50.) He also retains the ability to file a new protective custody request if he deems that necessary, and it would be investigated by staff pursuant to policy. (*Id.* ¶ 51.)

## ANALYSIS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "A

plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no

6

further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in correctional setting).

The Eighth Amendment imposes a duty on prison officials to take "reasonable measures" to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). At the same time, "prisons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Therefore, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). To be held liable for an Eighth Amendment violation, a defendant must have had "actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010). Phrased another way, a prison employee must have "acted with the equivalent of criminal recklessness, in this context meaning that they were actually aware of a substantial risk of harm to [the plaintiff's] health or safety, yet failed to take appropriate steps to protect him from the specific danger." *Klebanowski v. Sheahan*, 540 F.3d 633, 639 (7th Cir. 2008).

The present record reflects that prison staff are taking reasonable measures to protect Thompson from being harmed by other inmates. They have promptly

responded to his many requests for protective custody, which have cited different problems with different inmates, and have taken quick action to move him to a new area of the prison when necessary. He was immediately separated from Buie after he reported being assaulted and is currently in MCF's restrictive housing unit, where he is in a cell by himself and his movements are strictly limited. The inmates who have allegedly caused him problems in the past are not housed in the unit nor do they have access to that unit. Records reflect that prison staff do not intend to move Thompson out of restrictive housing unless he asks to return to general population or is transferred to a different facility. (ECF 29-1 ¶ 50.)

In light of Thompson's current housing assignment, he has not demonstrated a likelihood of success in proving that prison staff are acting with deliberate indifference to his need for protection from other inmates, or that he will suffer irreparable injury if he is not granted injunctive relief before this case is resolved. Although it is evident that Thompson would prefer to be at another prison, prisoners do not have a constitutional right to the housing assignment of their choice, and where best to house a prisoner is generally a matter committed to the discretion of prison officials. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996). Additionally, "[p]rison officials do not violate the Eight Amendment because the mode of protection they offer does not sit well with a prisoner." *Dale v. Poston*, 548 F.3d 563, 570 (7th Cir. 2008). Rather, if they offer reasonable protection from the threat, they have done their duty." *Id.* The present record reflects that officials have offered Thompson reasonable protection from the threat of harm posed by other inmates.

8

Nevertheless, if there is a change in circumstances which, in the view of prison officials, warrants a different housing assignment for Thompson, the Warden must promptly notify the court. This information may alter the court's analysis of whether immediate injunctive relief is necessary.

For these reasons, the plaintiff's motion for a preliminary injunction (ECF 4) is **DENIED**.

SO ORDERED on April 2, 2025.

  /s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT